1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10

11

12

JAMES STEVENS, an individual, on behalf
of himself and all others similarly situated;
HERMAN CORTEZ, an individual, on
behalf of himself and all others similarly
situated,

Plaintiffs,

vs.

SAFEWAY INC., a Delaware corporation;
THE VONS COMPANIES, INC., a
Michigan corporation; PAK N' SAVE, INC.,
a California corporation; DOMINICK'S
SUPERMARKETS, INC., a Delaware
corporation; RANDALL'S FOOD
MARKETS, INC., a Delaware corporation;
CARR-GOTTSTEIN FOODS CO., a
Delaware corporation; GENUARDI'S
FAMILY MARKETS LP, a limited
partnership; PAVILIONS, an unknown
business entity; TOM THUMB, an unknown
business entity; and DOES 1 through 10,
inclusive,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV 05-01988 MMM (SHx)


ORDER APPROVING FINAL
SETTLEMENT AND AWARDING
ATTORNEY'S FEES AND COSTS

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

On February 21, 2006, the court conditionally certified this case as a class action under the Fair

28

Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). The parties have now moved for final approval of

a proposed settlement of the claims asserted on behalf of the class.  Plaintiffs' counsel also seek an award of attorney's fees and costs.  The terms of the settlement are set forth in a Stipulation of Settlement dated November 27, 2007.  The court granted preliminary approval of the proposed settlement and set a hearing on final settlement approval for February 25, 2008.

## I.  FACTUAL & PROCEDURAL BACKGROUND

Plaintiff James Stevens filed this class action against defendant Safeway, Inc., and various business entities allegedly owned and operated by Safeway on March 18, 2005.  On December 7, 2005, an amended class action complaint was filed, adding Herman Cortez as a plaintiff.  Plaintiffs allege that Safeway, which operates a chain of retail supermarkets, has engaged in various unlawful employment practices including, *inter alia*, encouraging employees to work "off-the-clock," altering employee time cards to avoid the payment of wages, and threatening employees with discipline and termination if they admit to working off-the-clock.  Plaintiffs assert seven causes of action: (1) failure to pay overtime compensation in violation of Section 7 of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207; (2) interference with prospective rights in violation of Section 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140; (3) failure to pay overtime compensation in violation of California Labor Code §§ 510, 1194, and 1198; (4) failure to pay wages in violation of title 8, § 11070(2)(G) of the California Codes of Regulations; (5) failure to provide meal and rest breaks in violation of California Labor Code §§ 226.7 and 512; (6) failure to provide itemized statements in violation of California Labor Code § 226; and (7) unfair competition in violation of the California Unfair Competition Law ("UCL"), California Business & Professions Code §§ 17200 et seq.

The amended complaint defined two separate putative classes on whose behalf plaintiffs purported to sue: (1) a nationwide class of "all current and former hourly paid store level employees of Safeway who, at any time in the three-year period before the filing of the initial Complaint in this action or at any time thereafter, worked time off the clock for which they were not compensated";[1]

---

[1]First Amended Complaint, ¶ 5.

1   and (2) a California class of "all current and former hourly paid store level employees of Safeway

2   in California who, at any time in the four-year period before the filing of the initial Complaint in this

3   action or at any time thereafter, worked time off the clock for which they were not compensated."[2]

4   Plaintiffs sought to pursue their FLSA claim "as an 'opt-in' collective action pursuant to § 16(b) of

5   the FLSA."[3]  They sought to prosecute their ERISA and state law claims "as a conventional class

6   action . . . under Fed.R.Civ.P. 23(a) and (b)(1),(2) and (3)."[4]

7        On February 21, 2006, the court granted in part and denied in part plaintiffs' motion for

8   conditional certification of an FLSA class, limiting the class to "[a]ll current and former hourly paid,

9   store-level employees of Safeway, Vons, and Pak N' Save stores in California who, at any time in the

10   three years prior to the filing of this action, worked time off the clock for which they were not

11   compensated."  On July 7, 2006, the court dismissed plaintiffs' Rule 23 class allegations pursuant

12   to stipulation.  This limited all non-FLSA claims (i.e., the second through seventh causes of action)

13   solely to the named plaintiffs.  On March 3, 2006, defendants provided the names of approximately

14   175,000 current and former employees who fell within the FLSA class definition.  The court approved

15   a notice of FLSA class action; 5,162 individuals had filed consent forms on or before the opt-in deadline

16   of June 19, 2006.

17        On December 12, 2006, the court granted defendants' motion for partial summary judgment.

18   The court dismissed all claims against defendants Dominick's Supermarkets, Inc, Randall's Food

19   Markets, Inc., Carr-Gottstein Foods Co., Genuardi's Family Markets LP, Pavilions, and Tom

20   Thumb.  It granted partial summary judgment in Safeway's favor on plaintiffs' non-FLSA claims,

21   and likewise granted summary judgment in favor of all defendants on plaintiffs' second, third and

22   fourth causes of action.  The claims that remained to be tried, therefore, were (1) plaintiffs' first

23   cause of action under the FLSA against Safeway, Vons, and Pak N' Save; and (2) plaintiffs' fifth,

24   sixth, and seventh causes of action against Vons.

25   ────────────────

26      [2]*Id.*

27      [3]*Id.*, ¶ 12.

28      [4]*Id.*

On August 15, 2007, the parties filed a stipulation of settlement and joint request for preliminary approval of settlement. The court declined to approve the settlement preliminarily on November 5, 2007, directing the parties, if they wished to pursue settlement, to revise the terms of the agreement governing the process by which class members could object to the proposed settlement. The parties addressed the court's concerns and filed a revised stipulation of settlement on November 27, 2007. The court granted preliminary approval on December 11, 2007.

The settlement agreement resolved the claims of the named plaintiffs, as well as those of so many of the 5,162 members of the conditionally-certified FLSA class who worked for defendants on or after June 19, 2003 ("Eligible Plaintiffs").[5] It provided for a total gross settlement amount of $2,100,000, less applicable state and federal withholding taxes,[6] and stated that the $2,100,000 would be allocated in the following manner:

a.      Subject to the approval of the court, $20,000 was to be allocated to James Stevens and $10,000 to Herman Cortez as incentive payments for acting as named plaintiffs and in consideration of their release of any and all state law claims alleged on their behalf in the first amended complaint.[7]

b.      The balance of the settlement fund was to be paid to Eligible Plaintiffs in amounts determined by plaintiffs' counsel.[8]

c.      The amounts paid to Eligible Plaintiffs were to be calculated as follows:

    I.      Each Eligible Plaintiff was to receive $100.[9]

    ii.     Each Eligible Plaintiff was to receive a pro-rata share of the remaining funds based on the number of workweeks after June 18, 2003 during which he or

---

[5]FLSA Collective Action Stipulation of Settlement and Joint Request for Preliminary Approval ("Settlement Stipulation"), ¶ 13.

[6]*Id.*, ¶ 14.

[7]*Id.*, ¶ 18(a).

[8]*Id.*, ¶ 18(b).

[9]*Id.*, ¶ 18(c)(I).

she worked thirty hours or more for any of the three defendants.[10] The agreement provided that, within five court days of approval by the court of the terms of the stipulation, Poorman-Douglas, the settlement administrator, would mail a notice to the last known address of each Eligible Plaintiff setting forth the allocation for that individual provided by plaintiffs' counsel, and stating the number of workweeks on which the pro-rata share was based.[11] Poorman-Douglas was authorized to mail the class notice, create and administer the settlement fund, process claims against the fund, and disburse sums from the fund. The agreement required that, in carrying out these duties, it adhere strictly to the procedures set forth in the stipulation and escrow agreement. Defendants agreed to bear the cost of settlement administration and pay the settlement administrator for services rendered.[12] Poorman-Douglas was to mail the class notice to all Eligible Plaintiffs using addresses provided by plaintiffs' counsel. If any notice was returned, Poorman-Douglas was to attempt to find a valid address for that class member;[13] if efforts to locate an Eligible Plaintiff proved were unsuccessful, the agreement provided that that individual's share would be reallocated and paid to the remaining Eligible Plaintiffs.[14] The agreement stated that, within thirty days after the class notice was mailed, the parties would jointly apply for a final order approving the settlement.[15]

Other provisions of the agreement addressed what would occur after the court finally approved the settlement. It stated that, within thirty days after entry of a final order of approval, or within thirty days after the expiration of any applicable appeal period, whichever was later, Poorman-Douglas would remit to each Eligible Plaintiff his or her allocated portion of the settlement

---

[10]*Id.*, ¶ 18(c)(ii).

[11]*Id.*, ¶ 18(d).

[12]*Id.*, ¶ 18(e).

[13]*Id.*, ¶ 18(f).

[14]*Id.*, ¶ 18(g).

[15]*Id.*, ¶ 18(h).

fund as follows:

> (1)    50% of the allocation would be denominated wages (from which taxes would be withheld as required), and a W-2 would be issued for this amount;
>
> ii.    50% of the allocation would be denominated liquidated damages, and a 1099 form would be issued.[16]

All checks issued by Poorman-Douglas were to be negotiable for a period of ninety days.[17]  The agreement stated that any portion of the settlement fund that had not been paid out following completion of these processes, or 150 days after the mailing of the settlement fund checks, whichever was greater, would be tendered to the Los Angeles Regional Food Bank.[18]

In addition to these provisions for disbursement of the settlement fund, the agreement provided that plaintiffs and plaintiffs' counsel would be entitled to attorney's fees and costs in the amount of $1,500,000.[19]  Defendants agreed to set this amount aside to cover such expenses and to deposit the funds in a separate interest-bearing account within five days of receiving notice that the court had approved plaintiffs' application for attorney's fees and costs.[20]

The settlement agreement afforded Eligible Plaintiffs the opportunity to object to the terms of the settlement before final approval.[21]  Pursuant to the court's order granting preliminary settlement approval, all objections were to be postmarked no later than January 8, 2008; Poorman-Douglas was required to file the objections no later than February 1, 2008.  On February 1, an agent of the settlement administrator filed two timely objections to the settlement.[22]

---

[16]*Id.*, ¶ 18(i).

[17]*Id.*, ¶ 18(j).

[18]*Id.*, ¶ 18(k).

[19]*Id.*, ¶ 15.

[20]*Id.*

[21]*Id.*, ¶ 19.

[22]See Declaration of Jenny Penning Regarding Objections to Final Approval of Settlement (Penning Objections Decl."), ¶¶ 5-6.

## II.  DISCUSSION

### A.     Standard for Approving Class Action Settlements under the FLSA

"The FLSA was enacted for the purpose of protecting workers from substandard wages and oppressive working hours." *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352 (11th Cir. 1982) (citing *Barrentine v. Arkansas-Best Freight Sys.*, 450 U.S. 728 (1981)).  Given the often unequal bargaining power between employers and employees, Congress provided that an employee's FLSA rights cannot be waived.  See *id.*; *Yue Zhou v. Wang's Rest.*, C 05-279 PVT, 2007 WL 2298046, *1 (N.D. Cal. Aug. 8, 2007) ("An employee's claim[ ] under the FLSA is non-waivable").  As a result, FLSA claims can only be settled under the supervision of either the Secretary of Labor or the district court.  *Lynn's Food Stores, Inc.*, 679 F.2d at 1352-53.  To obtain district court approval, the parties must "present to the court a proposed settlement, upon which the district court may enter a stipulated judgment only after scrutinizing the settlement for fairness." *Yue Zhou*, 2007 WL 2298046 at *1 (citing *Schulte, Inc. v. Gangi*, 328 U.S. 108, 113 n. 8 (1946); *Lynn's Food Stores, Inc.*, 679 F.2d at 1353; and *Jarrard v. Southeastern Shipbuilding Corp.*, 163 F.2d 960, 961 (5th Cir. 1947)).  "In reviewing the fairness of such a settlement, a court must determine whether the settlement is a fair and reasonable resolution of a bona fide dispute." *Id.* (citing *Lynn's Food Stores, Inc.*, 679 F.2d at 1354 ("If a settlement in an employee FLSA suit . . . reflect[s] a reasonable compromise over issues, such as FLSA coverage or computation of back wages, that are actually in dispute[,] we allow the district court to approve the settlement in order to promote the policy of encouraging settlement of litigation")).

This standard is similar to that used in evaluating settlements under Rule 23(e) of the Federal Rules of Civil Procedure.  See FED.R.CIV.PROC. 23(e) (stating that the court should approve the terms of a class action settlement only after it has conducted a hearing and determined that the settlement is "fair, reasonable, and adequate"); see also *Evans v. Jeff D.*, 475 U.S. 717, 726 (1986); *Brask v. Heartland Automotive Services, Inc.*, No. 06-CV-00011 RHK/AJB, 2006 WL 2524212, *2 n. 1 (D. Minn. Aug. 15, 2006) (applying the standard applicable to Rule 23 class action settlements in evaluating an FLSA collective action settlement because "both the FLSA and Rule 23 require fair and reasonable settlements, [and] thus the standards set forth are applicable").  The district court's

role, in reviewing "what is otherwise a private consensual agreement negotiated between the parties to a lawsuit, must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice v. Civil Service Commission*, 688 F.2d 615, 625 (9th Cir. 1982), cert. denied, 459 U.S. 1217 (1983). This requires

> "a balancing of several factors which may include, among others, some or all of the following: the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Torrisi v. Tucson Electric Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993).[23]

The degree of importance attached to each factor is determined by the nature of the claim, the type of relief sought, and the facts and circumstances of each case. See *Officers for Justice*, 688 F.2d at 625.

Final approval of a class action settlement "is a matter of discretion for the trial court." *Pallas v. Pacific Bell*, C 89-2373 DLJ, 1999 WL 1209495, *6 (N.D. Cal. July 13, 1999) (citing *Torrisi*, 8 F.3d at 1375-76). In exercising its discretion, however, the district court "cannot unilaterally modify the provisions of a consent decree through its order approving the proposed decree." *Molski v. Gleich*, 318 F.3d 937, 946 (9th Cir. 2003) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir.1998) ("Neither the district court nor this court ha[s] the ability to delete,

---

[23]The parties have analyzed the fairness of the settlement using factors identified by the Eleventh Circuit in *Leverso v. SouthTrust Bank of Alabama National Association*, 18 F.3d 1527, 1531 n. 6 (11th Cir. 1994) ("The district court looked at the following factors: (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of Plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and the substance and amount of opposition to the settlement"). (See Joint App. at 10-11.) The court applies the fairness factors set forth by the Ninth Circuit in *Torrisi*, which are for the most part similar to those addressed by the parties.

1   modify or substitute certain provisions.  The settlement must stand or fall in its entirety" (citations

2   and internal quotation marks omitted), and *Jeff D.*, 475 U.S. at 726 (noting that a district court is

3   only permitted to accept the proposal, reject it and postpone the trial date to see if a different

4   settlement can be achieved, or reject it and try the case)).

5           **B.    Fairness of the Proposed Settlement**

6               **a.    Strength of Plaintiffs' Case**

7           The parties indicate that the proposed settlement is the product "of lengthy, intensive, and arms-

8   length negotiations concerning all of the claims and defenses presented, as well as the risks and expenses

9   of continued litigation."[24]   Regarding plaintiffs' likelihood of success on the merits, they note that

10  plaintiffs' expert had prepared a report laying out a methodology for surveying class members

11  anonymously; the expert opined that the survey might well show that class members had worked

12  significant time off-the-clock.[25]  Defendants, however, had filed a motion to decertify the conditionally

13  certified class, which was supported in part by the deposition testimony of class members who admitted

14  that they had performed no off-the-clock work at all.[26]  Given the competing evidence, and the parties'

15  knowledge of the universe of evidence likely to be presented at trial, both sides concluded that they

16  faced significant uncertainties in proceeding.[27]

17          Because of the potential difficulties plaintiffs faced marshaling evidence and responding to

18  defendants' arguments in support of decertifying the class, the court concludes that the strength of

19  plaintiffs' case weighs in favor of a finding that the proposed settlement is fair.  See, e.g., *Brask*, 2006

20  WL 2524212 at *2 ("The primary consideration in determining whether a settlement is fair and

21  reasonable is the strength and nature of the claim in light of the possible defenses," citing *City of Detroit*

22  *v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974)); *Harris v. McCrackin*, 04-2314-23, 2006 WL

23  1897038, *7 (D.S.C. July 10, 2006) ("Were Plaintiffs to prosecute the claims covered under the

24  ────────────

25          [24]*Id.* at 12.

26          [25]*Id.* at 14.

27          [26]*Id.*

28          [27]*Id.*

9

Proposed Settlement, they would be required to meet the burdens discussed above, which would be costly, time consuming, and subject to the risks and uncertainties of litigation. The Proposed Settlement, on the other hand, offers Plaintiffs assured, prompt and fair compensation. The difficulties of proof and strength of defenses balanced against the reasonable and prompt compensation scheme offered by the Proposed Settlement demonstrates the settlement's fairness, adequacy and reasonableness"); *Harden v. Raffensperger, Hughes & Co.*, 933 F.Supp. 763, 773 (S.D. Ind. 1996) ("Much of the reason for conditionally approving the settlement was that the inside directors were judgment-proof and the outside directors had potentially significant defenses").

**b.    The Risk, Expense, Complexity, and Likely Duration of Further Litigation**

The parties indicate in their joint application for final approval that at the time of settlement, they had engaged experts to testify at trial concerning (1) statistical methods used to determine class-wide damages, and (2) defendants' liability for off-the-clock work allegedly performed by members of the conditionally certified class.[28]  The parties had already exchanged initial and rebuttal expert reports by the time they reached a settlement.  They note that proceeding with expert discovery, and presenting evidence at a trial "heavily dependent" on expert testimony, would have involved significant additional expense for both sides.[29]

The parties also cite the fact that on May 9, 2007, the day before their second mediation session, defendants filed a motion to decertify the conditionally certified class.[30]  Had defendants' motion been granted and the action not been permitted to proceed as a collective action, each of the 5,162 opt-in plaintiffs would have had to initiate his or her own action to pursue a recovery.[31]  This would greatly have increased the expense to individual plaintiffs and resulted in protracted litigation of the FLSA issue.

The agreement to resolve the case avoided the expense of continued discovery, of further

---

[28]*Id.* at 13.

[29]*Id.*

[30]*Id.*

[31]*Id.*

1  litigating defendants' motion to decertify, and of trial preparation and trial. The cost of trying the case

2  would have been significant, and any judgment, favorable or unfavorable, might well have been

3  appealed, generating further costs.

4       The Ninth Circuit has expressed a "strong judicial policy that favors settlements, particularly

5  where complex class action litigation is concerned." *Linney v. Cellular Alaska Partnership*, 151 F.3d

6  1234, 1238 (9th Cir. 1998). Consequently, the risk, expense, and likely duration of further litigation also

7  weighs in favor of approving the settlement the parties have proposed. See *Officers for Justice*, 688

8  F.2d at 626; *Milstein v. Huck*, 600 F.Supp. 254, 267 (E.D.N.Y. 1984) ("The expense and possible

9  duration of the litigation are major factors to be considered in evaluating the reasonableness of this

10  settlement")

11          **c.**    **The Risk of Maintaining Class Action Status Throughout Trial**

12       The parties do not address the risk of maintaining class action status throughout trial. As noted,

13  however, prior to reaching a settlement, defendants filed a motion to decertify the conditionally certified

14  class. This motion was supported by the declarations of individuals who had opted-in to the FLSA class,

15  but admitted that they had not performed off-the-clock work while employed by defendants. At the time

16  the parties reached a settlement, the court had not yet received plaintiffs' opposition to this motion, and

17  had reached no conclusion as to whether it was appropriate to maintain the conditionally certified class.

18  Given the possibility that the court might have granted defendants' motion, and decertified the class,

19  this factor weighs in favor of approval of the proposed settlement.

20          **d.**    **The Amount Offered in Settlement**

21       As the Ninth Circuit has noted, "it is the very uncertainty of outcome in litigation and avoidance

22  of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is

23  [thus] not to be judged against a hypothetical or speculative measure of what *might* have been achieved

24  by the negotiators." *Officers for Justice*, 688 F.2d at 625 (emphasis original). Rather, "the very essence

25  of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Id.* at 624

26  (citations omitted). "'The fact that a proposed settlement may only amount to a fraction of the potential

27  recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should

28  be disapproved.'" *Linney*, 151 F.3d at 1242. Estimates of what constitutes a fair settlement figure are

tempered by factors such as the risk of losing at trial, the expense of litigating the case, and the expected delay in recovery (often measured in years).

At the time of settlement, plaintiffs' expert was nearing completion of his survey of the opt-in class. Plaintiffs represent that, based on the methodology set forth in the expert report, potential class-wide off-the-clock damages were approximately $3.5 million.[32] By contrast, defendants maintained that they had evidence, including the declarations of 1,948 employees and the depositions of forty-six members, showing (1) that many opt-in class members admittedly performed no off-the-clock work, and (2) that, among those individuals who claimed to have worked off-the-clock, "the isolated occurrences and limited amount of such work yielded a much lower potential exposure (even assuming liability) than Plaintiffs estimated."[33]

Given these competing arguments, the amount offered in settlement – a total of $2,100,000 in damages to the class members – appears fair and reasonable. As noted, each Eligible Plaintiff will receive $100 plus a pro-rata amount based on the number of weeks he or she worked over thirty hours during the limitations period. While this amount is lower than the $3.5 million in damages estimated by plaintiffs' expert, it nonetheless offers class members a substantial recovery that they might not have obtained had the court granted defendants' motion to decertify and/or had the matter proceeded to trial. The court therefore concludes that the amount offered in settlement is fair and adequate under the circumstances.

### e.    The Stage of the Proceedings and Extent of Discovery Completed

"'The extent of discovery may be relevant in determining the adequacy of the parties' knowledge of the case.'" *National Rural Telecommunications Cooperative v. DIRECTV, Inc.* 221 F.R.D. 523, 527 (C.D. Cal. 2004) (quoting MANUAL FOR COMPLEX LITIGATION, THIRD, § 30.42 (1995)). "'A court is more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case.'" *Id.* (quoting 5 W. Moore, MOORE'S FEDERAL PRACTICE, § 23.85[2][e] (Matthew Bender 3d

---

[32]*Id.* at 14.

[33]*Id.* at 14-15.

1  ed.)).  Because of the policy encouraging early settlement of lawsuits, however, the completion of

2  discovery is by no means a prerequisite to a determination that a settlement is fair.  See *Ressler v.*

3  *Jacobson*, 822 F.Supp. 1551, 1554-55 (M.D. Fla. 1992) (stating that "[t]he law is clear that early

4  settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should

5  be required to make these determinations," and concluding that "the plaintiffs [had] conducted sufficient

6  discovery to be able to determine the probability of their success on the merits, the possible range of

7  recovery, and the likely expense and duration of the litigation").  For this reason, a court need only

8  evaluate "whether counsel had sufficient information, through adequate discovery, to reasonably assess

9  the risks of litigation vis-á-vis the probability of success and range of recovery." *In re Lorazepam &*

10 *Clorazepate Antitrust Litigation*, 205 F.R.D. 369, 377 (D.D.C. 2002).

11         This matter was settled after the parties had completed all non-expert discovery, which included

12 the review of thousands of documents and the taking of more than fifty depositions in California and

13 out-of-state.[34]  They therefore had a clear picture of what evidence would be presented at trial.

14 Furthermore, before the court granted a final continuance of trial, the parties had disclosed trial

15 witnesses and exhibits, and filed memoranda of contentions of law and fact.[35]  Consequently, the court

16 is satisfied that plaintiffs had sufficient information to assess the risks of litigation and the likelihood

17 of prevailing on the merits of their claims at the time they entered into a settlement with defendants.

18 This factor therefore weighs in favor of approval of the settlement.

19                          **f.     The Presence of a Governmental Participant**

20         No government agency is or was a party to this action.  As a result, plaintiffs would not have

21 been able to rely on government assistance in proving their claims at trial or on appeal.  This factor

22 therefore weighs in favor of approving the proposed settlement.

23                          **g.     The Experience and Views of Counsel**

24         "The recommendations of plaintiffs' counsel should be given a presumption of reasonableness."

25 *Boyd v. Bechtel Corp.*, 485 F.Supp. 610, 622 (N.D. Cal. 1979) (citations omitted).  "Parties represented

26

27         [34]*Id.* at 13.

28         [35]*Id.*

                                        13

by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pacific Enterprises Securities Litigation*, 47 F.3d 373, 378 (9th Cir. 1995). Plaintiffs are represented by Mike Arias, managing partner of Arias Ozzello & Gignac LLP ("AOG").[36] Arias represents that the principals of AOG have more than forty-five years of combined experience in class action litigation.[37] The parties state that the settlement was reached after extensive negotiation, including mediation sessions in San Francisco on November 28, 2006 and May 10, 2007 before a highly regarded mediator.[38] Based on his experience representing plaintiffs in other class actions, his knowledge of the facts and law of this case, and the intensive nature of the parties' negotiations, Arias believes that the proposed settlement is in the best interests of the Eligible Plaintiffs and is fair, reasonable, and adequate.[39] The views of counsel therefore weigh in favor of approval.

### h.    Class Members' Reaction to the Proposed Settlement

Plaintiffs sent court-approved notices to 4,308 Eligible Plaintiffs following the court's preliminary approval of the proposed settlement.[40] The deadline for objecting to the settlement was January 8, 2008. As of February 1, 2008, the settlement administrator had received two timely objections, which are discussed *infra*. The fact that so few class members objected to the proposed settlement is strong evidence that it is both fair and adequate. See *Hanlon*, 150 F.3d at 1027 ("[T]he fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness"). Class members' reaction to the settlement therefore weighs in favor of approval.

### i.    Weighing the Factors

---

[36]Declaration of Mike Arias in Support of Joint Application for Final Approval of Proposed Settlement and for Entry of Final Judgment ("Arias Decl."), ¶ 1.

[37]*Id.*, ¶ 3.

[38]*Id.* at 12.

[39]*Id.* at 15.

[40]Declaration of Jenny Penning in Support of Joint Application for Final Approval of Proposed Settlement and for Entry of Final Judgment ("Penning Decl."), ¶ 3.

"Ultimately, the district court's determination [of fairness and adequacy] is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Officers for Justice*, 688 F.2d at 625 (citation omitted). "[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation." *Id.* Having considered the relevant factors, the court concludes that the circumstances surrounding the settlement weigh heavily in favor of approval. Accordingly, it finds that the amount of the proposed settlement is fair and adequate, and approves it.

### C.    Objections by Eligible Plaintiffs

As noted, the notice of proposed settlement that was distributed to each of the Eligible Plaintiffs reflected the number of weeks in which that plaintiff had worked more than thirty hours during the limitations period. That number was used to calculate the individual plaintiff's pro rata share of the settlement fund. The class notice advised plaintiffs that they had two options: they could "do nothing and remain an eligible plaintiff and participate in the settlement"[41] or they could object.[42] If a plaintiff objected to the number of weeks used by plaintiffs' counsel to calculate his or her pro rata share, the plaintiff was required to proffer facts and legal argument demonstrating his or her entitlement to a larger share.[43] If a plaintiff objected to the settlement on other grounds, the court was empowered, on its own motion or at plaintiff's request, to exclude him or her from the class, with the effect that the plaintiff would not be bound by the terms of the settlement.[44]

Poorman-Douglas received two timely objections to the notice of proposed settlement. The first objection was filed by Florene Fisher, who states that she worked for Safeway supermarkets in Hayward and San Leandro, California from March 1984 to April 2004.[45] Fisher appears to object to her pro-rata share of the settlement. She states that during her eighteen years of working for Safeway, thirteen "of

[41]Settlement Stipulation, Exh. C.

[42]*Id.*

[43]*Id.*

[44]*Id.*

[45]Penning Objections Decl., Exh. A.

15

1  those years pretty much was a lot of free time off the clock."[46]  Fisher asserts that she has several

2  witnesses who will support this claim.[47]

3       The parties oppose this objection on several grounds.  First, they note that Fisher has adduced

4  no admissible evidence regarding the number of weeks she worked.[48]  Fisher does not identify the weeks

5  during the limitations period during which she worked off the clock.  Thus, the court has no evidentiary

6  basis upon which to recalculate Fisher's settlement amount.  Second, the parties note that Fisher appears

7  to be confused regarding the statute of limitations applicable to her claim.[49]  Fisher asserts that she

8  worked time off the clock for thirteen years.  The relevant class period, however, runs from June 19,

9  2003 to the date Fisher's employment with Safeway ended in 2004.  Fisher provides no information

10 regarding additional weeks or off-the-clock time she worked during this period.  As a result, the court

11 overrules Fisher's objection to her settlement allocation.  Because her objection concerned only the

12 allocation, Fisher is bound by the terms of the stipulation of settlement, including the release of claims.[50]

13      The settlement administrator also received an objection from Mario B. Moreno, a current

14 Safeway employee from Fresno, California.[51]  The nature of Moreno's objection is unclear.  He states

15 that he was first employed by Safeway in 1990 and that throughout his employment with the company,

16 he has "seen events [in] which employers have misbehaved to the employees.  It is such a disgrace to

17 see that happen in a place that we as employees are in an environment that is supposed to be safe, free

18

19

20    [46]*Id.*

21    [47]*Id.*

22    [48]Joint Response to Timely Objections Filed in Response to the Proposed Settlement ("Joint
23 Response") at 2-3.

24    [49]*Id.* at 3.

25    [50]Fisher states that she intends to attend the final approval hearing on February 25, 2008.
26 (Penning Objections Decl., Exh. A).  Should she adduce admissible evidence demonstrating that her pro-
rata share of the settlement fund has been incorrectly calculated at that time, the court will reconsider
27 its ruling.

28    [51]*Id.*

of racism, sexual harassment and sexual orientation."[52]  He also states: "To be determined of how much we are 'worth' as it stipulates in the letter I received is utterly nonsense, but a matter of principal, and acceptance is the key."[53]

It appears that Moreno complains of discriminatory treatment in the workplace – an issue that is not the subject of this litigation.  To the extent he asserts that he should be compensated for damages suffered as a result of allegedly discriminatory treatment, Moreno misapprehends the nature of class claims that have been asserted.  To the extent he objects to the calculation of his settlement allocation, he neither argues nor presents admissible evidence that plaintiffs' counsel used an inaccurate number of weeks to calculate his pro-rata share.  Any objection asserted by Moreno to the amount of his allocation is therefore overruled.  Similarly, any objection asserted to the overall terms of the settlement is overruled because it is based on a misunderstanding regarding the nature of the claims.  Because Moreno did not request exclusion from the settlement class, because he affirmatively opted in to the collective action at an earlier point, and because it is unlikely he will independently pursue a claim against Safeway for wages due based on time worked off the clock, the court declines to exclude Moreno from the settlement class.  He too will be bound by the terms of the settlement, including the release of claims.

### D.     Disbursement of Amounts Outstanding after Allocation

In its order granting preliminary approval of the settlement, the court directed the parties to brief the fairness of the provision stating that any unclaimed settlement funds would be distributed to the Los Angeles Regional Food Bank.  The parties anticipate that the settlement administrator will be unable to deliver some class notices because Eligible Plaintiffs have moved and cannot be found.[54]  They represent that, if this occurs, that class member's allocation will be redistributed to other Eligible Plaintiffs pro rata.[55]  Thus, 100% of the settlement fund will be allocated to Eligible Plaintiffs to whom

---

[52]*Id.*

[53]*Id.*

[54]Joint Application at 8.

[55]*Id.*

class notices have been delivered. If any of the checks drawn in favor of these plaintiffs remain outstanding for 150 days (e.g., because the recipient does not negotiate the check, or because the check is undeliverable), however, the remaining amount be distributed to the Los Angeles Regional Food Bank.[56]

The parties assert that "this represents a fair solution to the inevitable, but limited, problem of unclaimed settlement allocations."[57] They contend that the amount of money unclaimed after the reallocation process is unlikely to be sufficiently significant that it will warrant further reallocation. The parties provide an example of the diminishing value of reallocation: "the average Eligible Plaintiff's allocation will be $487 ($2.1 million/4,308 plaintiffs). If 10 individuals fail to negotiate their checks, the result will be $4,870 reallocated among 4,298 individuals, or roughly $1.13 per person – an amount that will be outweighed by the cost of administration and postage."[58]

The court agrees that the parties' proposal for disbursement of any unclaimed settlement allocations to the Los Angeles Regional Food Bank is a fair and reasonable solution. In light of the explanation provided by the parties, the court approves this aspect of the proposed settlement.

### E.    Enhanced Payments to Named Class Representatives

The proposed settlement provides for a $20,000 award to named plaintiff James Stevens and a $10,000 award to named plaintiff Herman Cortez.[59] Plaintiffs contend it is fair and reasonable for these parties to receive enhanced awards given their substantial involvement in the litigation.[60]

Generally, when a person "join[s] in bringing [an] action as a class action . . . he has disclaimed any right to a preferred position in the settlement." *Officers for Justice*, 688 F.2d at 632. Notwithstanding this general rule, the Ninth Circuit has held that

---

[56]*Id.*

[57]*Id.* at 17.

[58]*Id.*

[59]Settlement Stipulation, ¶ 18(a).

[60]Plaintiffs' Application for an Award of Attorney's Fees, Reimbursement of Expenses, and for Incentive Awards ("Pl.'s App.") at 15-18.

1  "named plaintiffs, as opposed to designated class members who are not named plaintiffs,
2  are eligible for reasonable incentive payments.  The district court must evaluate their
3  awards individually, using 'relevant factors includ[ing] the actions the plaintiff has taken
4  to protect the interests of the class, the degree to which the class has benefitted from
5  those actions, . . . the amount of time and effort the plaintiff expended in pursuing the
6  litigation . . . and reasonabl[e] fear[s of] workplace retaliation.'"  *Staton v. Boeing Co.*,
7  327 F.3d 938, 977 (9th Cir. 2003) (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th
8  Cir. 1998)).

9  In *In re Mego Financial Corporation Securities Litigation*, 213 F.3d 454, 463 (9th Cir. 2000), the court
10 approved incentive awards of $5,000 for each of two class representatives who sued on behalf of a
11 potential class of 5,400 members, and achieved a settlement of $1.725 million. *Id.* at 463.  In *Cook*, 142
12 F.3d 1004, the court upheld a class action settlement in which a single named plaintiff who "spent
13 hundreds of hours with his attorneys and provided them with an 'abundance of information'" received
14 a $25,000 enhancement from a total recovery of more than $13,000,0000.  *Id.* at 1016.  Courts have
15 warned, however, that enhancements for named plaintiffs should be examined carefully, because "'[i]f
16 class representatives expect routinely to receive special awards in addition to their share of the recovery,
17 they may be tempted to accept suboptimal settlements at the expense of the class members whose
18 interests they are appointed to guard.'"  *Staton*, 327 F.3d at 975 (quoting *Weseley v. Spear, Leeds &
19 Kellogg*, 711 F.Supp. 713, 720 (E.D.N.Y. 1989)).

20       Plaintiffs' attorneys represent that Stevens and Cortez "were required to devote substantial time
21 and effort in order to assist in the prosecution of this litigation on behalf of the Class."[61]  According to
22 declarations submitted by the named plaintiffs themselves, Stevens and Cortez performed, *inter alia*,
23 the following tasks: "(1) stepped forward and offered to intervene in this action and to serve as class
24 representatives after the original class representatives were disqualified from continuing to serve in such
25 a capacity; (2) prepared . . . and sat for a deposition on class certification issues; (3) responded to written
26 discovery requests; (4) gathered and produced documents for use in connection with the case; (5)

27
28       [61]*Id.* at 18.

19

prepared . . . and sat for a second deposition devoted to merits issues; (6) reviewed the transcripts of their depositions for any inaccuracies; (7) prepared declarations in support of one or more motions filed in this matter; (8) regularly reviewed pleadings, correspondence and other documentation received from Class Counsel in order to keep themselves apprised of the progress of the litigation; (9) worked with Class Counsel to present this case to the Court; and (10) reviewed and approved pleadings, motions and the settlement agreement."[62]  The court notes additionally that both Stevens and Cortez had individual claims remaining for trial.  These claims alleged failure to provide meal and rest breaks in violation of California Labor Code §§ 226.7 and 512; failure to provide itemized statements in violation of California Labor Code § 226; and unfair competition in violation of the California Unfair Competition Law ("UCL"), California Business & Professions Code §§ 17200 et seq.  Like plaintiffs' FLSA collective claims, these individual claims will be dismissed as a result of the settlement.

Given the substantial efforts Stevens and Cortez made on behalf of the class, the risks inherent in bringing a lawsuit against an employer in one's own name, the individual claims being compromised, and the fact that the enhancements represent a relatively modest percentage of the $2,100,000 total recovery, the court finds that it is fair and reasonable for Stevens to receive an incentive payment of $20,000 and for Cortez to receive an incentive payment of $10,000.

---

[62]*Id.*; Declaration of James Stevens in Support of Application for Incentive Payment ("Stevens Decl."), ¶¶ 3-10; Declaration of Herman Cortez in Support for Incentive Payment ("Cortez Decl."), ¶ 3.  More specifically, Stevens declares, *inter alia*, that he has spent five hours per week since September 2002 gathering information for the lawsuit.  (Stevens Decl., ¶ 3).  During the opt-in period, he called more than 400 Vons and Safeway stores from San Francisco to San Diego, and spoke to a minimum of four department heads to encourage employees to submit opt-in notices.  (*Id.*).  He contacted the president of each union local in California and asked that he or she encourage its membership to join the action.  (*Id.*).  After Vons obtained declarations from employees supporting defendants, Stevens called more than 250 of the 2,000 employees interviewed by defense attorneys to determine whether they had provided the declaration as a result of intimidation.  (*Id.*, ¶ 4).  He also visited more than 100 local stores to interview employees and obtain statements confirming that they had worked off the clock.  (*Id.*, ¶ 8).

Cortez, for his part, asserts that during the case, he spoke regularly with and assisted his attorneys; that he traveled to Irvine and spent a full day in deposition there; that he responded to several sets of written discovery; and that he spent hours speaking with potential trial witnesses, sharing work experiences.  (Cortez Decl., ¶ 3).

1

**F.    Attorney's Fees, Expenses, and Costs**

2      The FLSA provides for the payment of attorney's fees and costs.  29 U.S.C. § 216(b) ("The court

3  in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable

4  attorney's fee to be paid by the defendant, and costs of the action").  In "common-fund" cases such as

5  this one, "where the settlement or award creates a large fund for distribution to the class, the district

6  court has discretion to use either a percentage or lodestar method." *Hanlon*, 150 F.3d at 1029 (citing

7  *In re Washington Public Power Supply System Sec. Litig.*, 19 F.3d 1291, 1295 (9th Cir. 1994)).  Whether

8  a court applies the lodestar or the percentage method, the Ninth Circuit "'require[s] only that fee awards

9  in common fund cases be *reasonable* under the circumstances.'" *In re Washington Public Power Supply*

10  *System Securities Litigation*, 19 F.3d at 1295 n. 2 (quoting *Florida v. Dunne*, 915 F.2d 545 (9th Cir.

11  1990) (emphasis original)).

12      The lodestar figure is "the number of hours reasonably expended on the litigation multiplied by

13  a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  The lodestar

14  "presumptively provides an accurate measure of reasonable attorney's fees."  See *Harris v. Marhoefer*,

15  24 F.3d 16, 18 (9th Cir. 1994); *Clark v. City of Los Angeles*, 803 F.2d 987, 990 (9th Cir. 1986).  A court

16  may increase or decrease the lodestar amount in rare or exceptional cases.  See *Blum v. Stenson*, 465

17  U.S. 886, 898-901 (1984); *Harris*, 24 F.3d at 18; *Clark*, 803 F.2d at 990-91.

18      A court employing this method to determine the amount of an attorney's fees award does not

19  directly consider the multi-factor test developed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d

20  714, 717-19 (5th Cir. 1974), and *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69-70 (9th Cir. 1975).[63]

21  Rather, as a first step, it determines the lodestar amount, which subsumes certain of the *Kerr/Johnson*

22  factors, i.e., the novelty and complexity of the issues, the special skill and experience of counsel, the

23

24      [63]Under the *Johnson/Kerr* test, the factors to consider in determining the amount of attorney's
25  fees awarded include: "(1) the time and labor required, (2) the novelty and difficulty of the questions
involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other
26  employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee
is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount
27  involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the
'undesirability' of the case, (11) the nature and length of the professional relationship with the client,
28  and (12) awards in similar cases." *Kerr*, 526 F.2d at 70; see also *Johnson*, 488 F.2d at 717-19.

1
2
3
4
5

quality of the representation, and the results obtained.  See *Blum*, 465 U.S. at 898-900; *Clark*, 803 F.2d at 990-91 and n. 3; *Cunningham v. County of Los Angeles*, 879 F.2d 481, 484 (9th Cir. 1988).  Next, the court looks to the *Johnson/Kerr* factors that have not been subsumed within the lodestar calculation to determine whether to increase or reduce the presumptively reasonable lodestar fee.  See *Clark*, 803 F.2d at 991.

6
7
8
9
10
11
12
13
14

Under the percentage-of-fund method, the Ninth Circuit has established 25% of the common fund as a benchmark for percentage attorney's fees award.  See *Fischel v. Equitable Life Assurance Society of U.S.*, 307 F.3d 997, 1006 (9th Cir. 2002); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 101, 1311 (9th Cir. 1990).  "The benchmark percentage should be adjusted, or replaced by a lodestar calculation, [however,] when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors."  *Six (6) Mexican Workers*, *supra*, 904 F.2d at 1311.  In evaluating the reasonableness of the fee award, the court must take into account all the circumstances of the case.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir.), cert. denied *sub nom. Vizcaino v. Waite*, 537 U.S. 1018 (2002).

15
16

In *Dunne*, 915 F.2d 542, where the appellate court approved the district court's use of the lodestar method to award fees in a common fund case, the Ninth Circuit explained:

17
18
19
20
21
22
23

"Despite the recent ground swell of support for mandating a percentage-of-the-fund approach in common fund cases, . . . we require only that fee awards in common fund cases be reasonable under the circumstances.  Accordingly, either the lodestar or the percentage-of-the-fund approach 'may, depending upon the circumstances, have its place in determining what would be reasonable compensation for creating a common fund.'"  See *id.* at 545 (quoting *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989)).

24
25

Here, the stipulation of settlement provides for the creation of a $1,500,000 fund to cover attorney's fees, expenses, and costs.[64]  This fund is separate from the settlement fund to be distributed

26
27

28

[64]Settlement Stipulation, ¶ 15.

1  to the class members and will not reduce class recovery.[65]  Plaintiffs' attorneys assert that they have

2  incurred more than $616,000 in costs, which amount includes the cost of notice and notice

3  administration.[66]  They also contend that they have expended more than 4,200 hours litigating the case,

4  which would result in a lodestar figure greater than $1,250,000.[67]  Because the $1,500,000 fund is

5  intended to cover both fees and costs, however, plaintiffs' counsel request fees of $884,000

6  ($1,500,000 less costs of $616,000).[68]  They argue that such a fee award is reasonable under the

7  lodestar method.[69]

8                    **a.    Counsel's Hourly Rates**

9        In determining the reasonableness of an attorney's rate, the court must review the "prevailing

10  market rates in the relevant community." *Blum*, 465 U.S. at 895 & n. 11.  The proper rate to utilize

11  in computing fees is that which a lawyer of comparable skill, experience and reputation would

12  command in the relevant community.  *Id.* at 895 n. 11. "The burden is on the fee applicant to

13  produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates

14  are in line with those prevailing in the community."  *Id.*; see *Guam Soc'y of Obstetricians &*

15  *Gynecologists v. Ada*, 100 F.3d 691, 696 (9th Cir. 1996) (noting that declarations from attorneys in

16  the community can provide adequate proof of the reasonableness of counsel's rates); see also

17  *Earthquake Sound Corp. v. Bumper Industries*, 352 F.3d 1210, 1215 (9th Cir. 2003) (discussing the

18  affidavit of "an attorney practicing in the same region a Earthquake's attorneys" that opined that

19  "Earthquake's attorney rates were reasonable and customary" in assessing a fee award).

20        The relevant community is that in which the district court sits.  See *Schwartz v. Secretary of*

21  *Health and Human Servs.*, 73 F.3d 895, 906 (9th Cir. 1995).  Declarations regarding the prevailing

22

23        [65]Pl.'s App. at 6.

24        [66]*Id.* at 5; Declaration of Mike Arias in Support of Application for Award of Attorney's Fees and

25  Reimbursement of Expenses ("Arias Fees Decl."), ¶¶ 13-14.

26        [67]Pl.'s App. at 5-6; Arias Fees Decl., ¶¶ 7-9.

27        [68]Pl.'s App. at 10.

28        [69]*Id.* at 9.

market rate in the relevant community suffice to establish a reasonable hourly rate.  See *Widrig v. Apfel*, 140 F.3d 1207, 1209 (9th Cir. 1998); *Guam Soc'y of Obstetricians & Gynecologists*, 100 F.3d at 696.

The partners in Arias Ozzello & Gignac have represented plaintiffs in class action lawsuits of various types since 1988.[70]  During that time, Mike Arias, the partner responsible for overseeing the firm's work in this action, and his partners have represented plaintiffs in more than 100 different actions.[71]  The firm charges rates ranging from $550 per hour for partner time to $50 per hour for document clerk time.[72]  Arias maintains that his firm sets its hourly rates according to the prevailing market rates, and that it is "routinely awarded attorneys' fees based upon its current hourly rates."[73]  The rates charged by the firm are not dependent on whether time is charged hourly or fees are contingent.[74]  As a result, Arias argues, "these rates are necessarily market sensitive and market competitive for the level of services provided by" the firm.[75]

The only evidence of the reasonableness of counsel's rates that plaintiffs have adduced is Arias' declaration.  They do not proffer the declarations of attorneys outside the firm or fee surveys[76]

[70]Arias Fees Decl., ¶ 4.

[71]*Id.*

[72]*Id.*, ¶ 8.

[73]*Id.*, ¶ 11.

[74]*Id.*

[75]*Id.*

[76]Courts frequently use survey data in assessing the reasonableness of attorney's fees.  See *Fish v. St. Cloud State Univ.*, 295 F.3d 849, 852 (8th Cir. 2002) ("The parties presented two surveys of hourly rates, one reporting fees received by seven Twin Cities class action firms and the other reporting fees received by sixty-two firms doing a variety of work around the state.  The court set individual hourly rates at the median of the class action survey and near the upper limit of the statewide survey, also taking into account the number of years an attorney had been admitted to practice"); *American Petroleum Inst. v. United States EPA*, 72 F.3d 907, 912 (D.C. Cir. 1996) ("Petitioners have provided support for the reasonableness of their rates through affidavits and a survey of rates and we hold that these rates are reasonable"); *Martin v. University of South Alabama*, 911 F.2d 604, 607 (11th Cir. 1990) ("Based on the testimony and survey produced by plaintiffs the reasonable non-contingent hourly rate for civil rights lawyers in the relevant market (Alabama) was found to be $135 to $150 per hour for

to show that their attorneys' hourly rates are in line with the rates charged by lawyers who provide similar services in the Los Angeles area. Arias's declaration alone does not provide sufficient evidence for the court to determine the reasonableness of the rates. See *Southerland v. International Longshoremen's and Warehousemen's Union*, 845 F.2d 796, 801 (9th Cir. 1987) (the statement of plaintiff's counsel that his rates were equivalent to the rates prevailing in the community was an "insufficient basis from which to conclude that the rates requested are 'reasonable' "); *Jordan v. Mutnomah County*, 815 F.2d 1258, 1263 (9th Cir. 1987) ("The fee applicant has the burden of producing satisfactory evidence, *in addition to the affidavits of its counsel*, that the requested rates are in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation," citing *Blum*, 465 U.S. at 895-97 n. 11 (emphasis added)). Without further information, therefore, the court cannot find that the rates charged by Arias Ozzello & Gignac were reasonable.

Because plaintiffs have not demonstrated that their attorneys' hourly rates are reasonable, the court cannot award fees based on the present record. Nonetheless, it will review the balance of the application, however, to determine whether the amount of time expended is reasonable, and direct plaintiffs to submit further evidence regarding the reasonableness of counsel's rates. With that information in hand, the court will then make a final determination as to the amount of the attorney's fees award.

### b.     Reasonableness of Hours Expended

A court may award attorney's fees only for the number of hours it concludes were reasonably expended litigating the case. "Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley*, 461 U.S. at 434. At the outset, "[t]he fee applicant bears the burden of documenting the appropriate hours expended in litigation and must submit evidence in support of those hours worked." *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992).          Arias contends that the attorneys

senior counsel and $105 to $115 per hour for junior counsel").

and professional staff employed by the firm performed more than 4,200 hours of work in connection with this litigation.[77]  This represents more than 2,800 hours of attorney time and 400 hours of legal assistant time.[78]  Arias derives these totals from time records that attorneys and professional staff input daily into a computerized billing system maintained by the firm.[79]

Plaintiffs' attorneys argue that the case presented several novel and difficult legal challenges.[80]  They assert that "[i]n addition to the difficulty [of] maintaining a collective action with more than 5,000 plaintiffs and arranging for and defending more than 30 plaintiff depositions, th[e] case required [them] to confront numerous complicated legal issues."[81]  Among these, they contend, was the need to prove liability and damages for more than 5,000 plaintiffs state-wide.  Counsel contend they had to learn defendants' organizational and labor budgeting systems in a short time frame, and devise a system of statistical sampling and surveying to prove class-wide damages at mediation and trial.[82]

Counsel also argue that the case required "significant skill to perform the necessary legal services competently."[83]  In addition to the organizational and legal challenges identified, they assert they spent considerable time developing theories of certification, liability, and damages.[84]  They also report that they expended substantial time obtaining discovery in advance of mediation,  which resulted in a favorable outcome for the class.[85]

---

[77]*Id.*, ¶ 7.

[78]*Id.*, ¶ 8.

[79]*Id.*

[80]Pl.'s App. at 10.

[81]*Id.*

[82]*Id.*

[83]*Id.*

[84]*Id.*

[85]*Id.* at 10-11.

1    The court is unable to conclude, based solely on Arias' declaration, that the hours expended
2    by plaintiffs' counsel were reasonable.  Arias estimates the number of hours billed by attorneys and
3    staff at his firm, but provides no billing invoices or other contemporaneous records documenting the
4    hours recorded or billed.  Nor does he provide any particularized breakdown of hours, merely stating
5    that "substantial" or "considerable" amounts of time were spent performing various types of tasks.
6    This is not sufficient to support a finding that the hours charged were reasonable.  See *Hensley*, 461
7    U.S. at 433 ("The party seeking an award of fees should submit evidence supporting the hours
8    worked and rates claimed.  Where the documentation of hours is inadequate, the district court may
9    reduce the award accordingly"); *Cunningham*, 879 F.2d at 484 (noting that fee awards can be
10   reduced based on "inadequate documentation"); *Chalmers v. City of Los Angeles*, 796 F.2d 1205,
11   1210 (9th Cir. 1986) ("counsel bears the burden of submitting detailed time records justifying the
12   hours claimed to have been expended"); *Pac. W. Cable Co. v. City of Sacramento*, 693 F.Supp. 865,
13   870 (E.D. Cal. 1988) ("[t]he cases do not indicate that every minute of an attorney's time must be
14   documented; they do, however, require that there be adequate description of how the time was spent,
15   whether it be on research or some other aspect of the litigation. . .").

16          Citing the percentage-of-fund method, plaintiffs contend that the reasonableness of the fees
17   sought is confirmed by comparison to the Ninth Circuit benchmark of 25% of the common fund.[86]
18   Plaintiffs argue that the $884,000 in fees they request is 24.6% of the $3,600,000 defendants have
19   agreed to pay in settlement.[87]   The $3,600,000 figure, however, *includes* the $1,500,000 that
20   defendants have agreed to pay in attorney's fees and costs.  When the fee request of $884,000 is
21   compared to the $2,100,000 amount of the common fund that will be distributed to class members,
22   however, it is apparent that plaintiffs' fee request is approximately 42% of the settlement fund.  This
23   far exceeds the 25% benchmark.  Thus, the percentage-of-fund method does not demonstrate that
24   the requested fees are reasonable.

25          While the court could simply award fees equal to 25% of the settlement fund, it will afford

26   _____

27   [86]*Id.* at 13.

28   [87]*Id.*

27

1
2
3

plaintiffs' counsel an additional opportunity to support their current request by providing evidence demonstrating that their rates are reasonable and detailing the hours they expended. The court will then determine whether an award of $884,000 in fees is appropriate.

4

### c. Expenses And Costs

5
6
7
8
9
10
11
12
13

Plaintiffs' request for costs suffers from the same lack of detail as their request for attorney's fees. The parties' settlement agreement provides the $1,500,000 fund will be used to pay not only fees, but $616,000 in costs advanced by plaintiffs' counsel. The district court has discretion to determine an appropriate award of costs and expenses. See *Trans Container Services v. Security Forwarders, Inc.*, 752 F.2d 483, 488 (9th Cir. 1985). One court has noted that, in evaluating the reasonableness of costs, "the judge has to step in and play surrogate client." See *In re Continental Illinois Securities Litigation*, 962 F.2d 566, 572 (7th Cir. 1992). In keeping with this role, the court must look to prevailing rates and practices in the legal marketplace to assess the reasonableness of the costs sought. *Missouri v. Jenkins*, 491 U.S. 274, 286-87 (1989); *Blum v. Stenson*, 465 U.S. 886, 895 (1984).

14
15
16
17
18
19

Plaintiffs' counsel represents that the $616,000 in expenses includes: (1) more than $190,000 in notice administration; (2) more than $290,000 in expert fees for statistical, survey, industrial engineering, forensic accounting, damage calculation, and other experts on issues of both damages and liability; (3) approximately $11,500 in travel-related expenses; (4) more than $27,000 in deposition-related expenses; (5) approximately $5,200 in legal research fees; (6) and approximately $10,000 in filing, service, and document management expenses.[88]

20
21
22
23
24
25
26

Counsel provide only unsupported approximations of the amount of costs incurred during the litigation. Arias's declaration that plaintiffs incurred "more than $190,000 in notice administration," for instance, does not permit the court to determine what amount was actually paid for class administration services, or to evaluate whether the expenditure was reasonable. Because the court is cast in the role of "surrogate client," approximating litigation costs is not adequate. Rather, the court directs plaintiffs to provide evidence documenting the costs their attorneys have incurred and for which they seek reimbursement.

27
28

[88]Arias Fees Decl., ¶ 13.

1

2

### III. CONCLUSION

3

For the reasons stated, the court approves the terms of the stipulated settlement that relate to (1)

4

the amount of the settlement fund, (2) disbursement of the fund to Eligible Plaintiffs, (3) disbursement

5

of any unclaimed funds to the Los Angeles Regional Food Bank, and (4) the provision of incentive

6

payments to the named plaintiffs.  The court also approves the settlement's provision that plaintiff's

7

counsel are entitled to recover reasonable attorney's fees and costs.  The court cannot presently

8

determine the amount of fees and costs that should be awarded, however, as counsel has provided

9

inadequate evidence supporting their request for $1,500,000.  Plaintiffs are directed to provide the court

10

with the type of supporting documentation and evidence described herein no later than ten (10) days

11

from the date of this order.  The court will determine whether the $1,500,000 requested is reasonable

12

or whether some other amount of properly awarded after reviewing the supplemental filing.

13

14

15

DATED: February 25, 2008

_____

MARGARET M. MORROW

16

UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27

28